# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

DAVID M. HUMPHRIES, On Behalf of Himself and All Others Similarly Situated,

        Plaintiff,

        v.

BP CORPORATION NORTH AMERICA, INC.; BP CORPORATION NORTH AMERICA, INC.'S BOARD OF DIRECTORS; BP CORPORATION NORTH AMERICA, INC. SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE; ROBERT A. MALONE, STEPHANIE C. ADKINS, RICHARD DORAZIL, LAMAR MCKAY; NEIL SHAW; THOMAS L. TAYLOR; GREGORY T. WILLIAMSON; and DOES 1-20,

        Defendants.

No.:

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

### JURY TRIAL REQUESTED

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ................................................................. 1

    A.   BP Launches A Scheme To Mislead The Public About Its Safety Program While Simultaneously Cutting Costs ................................... 2

    B.   Recent Admissions Establish That Defendants Breached Their Fiduciary Duties. .................................................................................. 3

II.   JURISDICTION AND VENUE ........................................................... 4

III.   PARTIES ............................................................................................. 5

    A.   The Plaintiff ................................................................................ 5

    B.   The Defendants -- ESP Plan Fiduciaries And The Bases For Their Fiduciary Status ................................................................. 5

IV.   THE ESP PLAN:  STRUCTURE AND PLAN TERMS ....................... 8

V.   THE LAW UNDER ERISA ................................................................. 11

VI.   THE ESP PLAN FIDUCIARIES' BREACH OF DUTIES ................... 13

VII.   CLASS ACTION ALLEGATIONS ..................................................... 14

VIII.   BP'S SCHEME TO CONCEAL MATERIAL INFORMATION RESULTING IN THE ARTIFICIAL INFLATION OF BP ADSs AND THE BP STOCK FUND ....................................................................... 17

    A.   Introduction ................................................................................. 17

    B.   2005-2008: BP Falsely Represents That Past Mistakes Have Been Corrected. . 19

        1.   2005: Texas City Disaster ................................................... 19

        2.   BP Issues An Incident Investigation Report. ........................ 21

        3.   After The Texas City Disaster, BP Makes False Statements And Omits Material Facts Regarding Safety Improvements. ......................... 21

        4.   Cost And Consequences To BP Of The Texas City Disaster ................. 21

        5.   2006:  Oil Leakage in Prudhoe Bay, Alaska ....................... 22

        6.   BP's Annual Filings On Form 20-F Tout Safety Measures Taken In Response To Past Incidents. ................................. 22

        7.   CEO Hayward's Empty Promises of Safety First and Commitment To Change ......................................................... 23

i

## TABLE OF CONTENTS (cont.)

Page

IX.   BP'S FAILURE TO DISCLOSE MATERIAL INFORMATION
      DURING THE CLASS PERIOD ..................................................................24

X.    EARLIER INCIDENTS PROVIDED WARNINGS OF IDENTICAL
      RISKS ..................................................................................................32

XI.   THE DEEPWATER HORIZON OPERATIONS.......................................33

XII.  THE EXPLOSION AND SINKING OF THE DEEPWATER HORIZON
      AND BP'S EFFORTS TO CONCEAL THE SEVERITY AND
      RAMIFICATIONS OF THE SPILL.............................................................40

XIII. THE ESP PLAN LOSSES EXCEED $1 BILLION ......................................45

COUNT ONE .................................................................................................46

COUNT TWO..................................................................................................48

COUNT THREE...............................................................................................51

COUNT FOUR .................................................................................................53

COUNT FIVE..................................................................................................55

PRAYER FOR RELIEF ....................................................................................57

REQUEST FOR JURY TRIAL ..........................................................................59

### CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

Plaintiff David M. Humphries ("Plaintiff"), individually, as a representative of the BP Employee Savings Plan ("ESP Plan" or "Plan"), and on behalf of a class of similarly situated participants in and beneficiaries of the Plan (collectively "Participants"), by his attorneys, alleges:

## I.    NATURE OF THE ACTION

1.     This is a class action brought under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et. sq. ("ERISA") alleging breaches of fiduciary duty by Defendants, as hereinafter more specifically enumerated and described with respect to the ESP Plan.

2.     Plaintiff brings this class action on behalf of all Participants in the ESP Plan who purchased shares of and invested in the BP Stock Fund between June 30, 2005 and June 1, 2010 (the "Class Period") by investing their income and savings into the ESP Plan and who suffered losses from the events leading up to and following the April 20, 2010, catastrophic explosion of the Deepwater Horizon oil rig ("Deepwater Horizon") in the Gulf of Mexico.

3.     Defendants breached their fiduciary duties to Plaintiff, the ESP Plan, and the Participants in violation of ERISA by failing to prudently and loyally manage the ESP Plan's investments in the BP Company Stock Fund, which invests primarily in BP American Depositary Shares ("ADSs"), equity interests in BP p.l.c., ("BP"), an English publicly-held company.  The BP ADSs are publicly traded on the New York Stock Exchange.

4.     Specifically, Defendants knew or should have known that investment in the BP Stock Fund was an imprudent investment for the Participants due to BP's longstanding and blatant disregard of safety reports, warnings, and recommendations necessary to prevent catastrophic disasters that threaten the environment and the viability of BP as a going concern. Defendants further knew or should have known that BP's self-proclaimed commitment to the safety and health of people and the environment made to Participants and the general public through formal and informal statements and publications were untrue and misleading.  After the

2010 Deepwater Horizon oil spill in the Gulf of Mexico, in a shocking admission in direct contradiction to its prior promises and representations, BP conceded that it was ill-prepared to resolve a deepwater oil leak, thus illustrating how BP blatantly stressed profits before safety and inexplicably placed in peril the retirement assets of Plaintiff and more than 39,000 other participants who invested in the BP Stock Fund.

### A.   BP Launches A Scheme To Mislead The Public About Its Safety Program While Simultaneously Cutting Costs

5.     Beginning in or about June 2005, BP promoted the Gulf as one of its largest growth areas in the United States.  At the same time, BP pledged that it had implemented protocols to ensure regulatory and safety compliance and to conduct its business in a manner to prevent or minimize damage to the environment.  BP devoted substantial resources to its campaign to portray itself as a company devoted to the safety of its operations and the health of its employees, the public, and the environment in an effort to remove the stigma associated with its long history of neglecting equipment, pressuring or harassing employees not to report problems, and ignoring the safety reports, warnings, and recommendations of investigators and government officials.  These early practices resulted in a number of infamous catastrophes and legal conflicts, including, among others: at least 23 deaths at a Texas refinery in the 30 years leading up to 2005; a 2005 explosion at the Texas refinery that killed 15 and injured 170; severe corrosion to a pipe line with substantial oil leakage causing a subsequent closure of an oilfield in Alaska's Prudhoe Bay in 2006; payment of over $60 million in fines relating to the Texas and Alaska incidents; an Occupational Safety and Health Administration ("OSHA") fine exceeding $87 million for safety problems relating to the Texas incident; probation after pleading guilty to a felony violation of the Clean Air Act relating to the Texas incident and a misdemeanor violation relating to the Alaska incident; and a Congressional committee finding evidence of "draconian" cost cutting leading up to the Alaska incident.

6.     In addition, a "safety campaign" launched in 2005 resulted in a number of misleading public and private statements to Plaintiff, Participants, and the general public designed to portray BP's commitment to safety, public health, and the environment, including,

2

but not limited to: filings with the United States Securities and Exchange Commission ("SEC") beginning in 2005 touting BP's safety program; a 2007 promise by new-CEO Tony Hayward to "focus like a laser" on safety; a 2008 interview by Hayward expressing hope for the future in comparison to BP's past practice of ignoring "the operating people on safety and reliability;" a press release issued in 2007 that promised comprehensive efforts to improve BP's safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities; a 2008 Strategy Presentation declaring safe and reliable operations as BP's "number one priority;" a 2008 SEC filing declaring safety as BP senior leadership's "highest priority;" and a 2009 Strategy Presentation declaring BP's continuing focus on safety and asset reliability.

**B.      Recent Admissions Establish That Defendants Breached Their Fiduciary Duties.**

7.      In spite of BP's ongoing sham safety campaign, BP deliberately ignored internal warnings and reports of serious breaches in safety requirements in the time leading up to the 2010 disaster, all of which were kept confidential and undisclosed to Plaintiff, Participants, and the general public.  Recent admissions by BP establish that Defendants were aware or should have been aware that BP continued its course of neglecting equipment, pressuring or harassing employees not to report problems, ignoring safety reports, warnings, and recommendations of investigators and government officials, and failing to establish state-of-the-art disaster recovery programs.  This is demonstrated by, among other things: a private and confidential 2008 email from a BP project manager warning that incomplete and outdated procedures on a BP oil rig could lead to "catastrophic" operator errors; subsequent internal findings by an engineering documents manager that of the over 7,000 drawings and documents requiring approval not only to safely operate a facility, but indeed to *begin* operations, almost 90% never received approval of any kind; confirmation of the engineering document manager's findings through an internal investigation by an independent firm that served as BP's ombudsman; a 2009 complaint by the engineering documents manager against BP for its failure to remedy its severe deficiency in safety documents, sealed and unavailable to the public until May 12, 2010; private internal

3

documents showing serious problems and safety concerns with the Deepwater Horizon rig's well casing and blowout preventer as far back as 11 months prior to the 2010 disaster; various governmental accident reports finding improper operation of equipment, improper training for employees assigned to well control duties, and major tasks performed without following established management procedures; and a 2007 government study finding improper cementing as a factor in 18 of 39 blowouts between 1992 and 2006 and further describing the potential for blowouts in deepwater drilling.

8.    Participants purchased and held shares of the BP Stock Fund based upon Defendants' repeated assurances of BP's (and its related entities') safe operations and adequate disaster recovery programs, which assurances were reflected in the inflated price of the BP Stock Fund. As the truth about BP's (and its related entities') safety operations and reporting have emerged, Participants have seen the value of their shares of the BP Stock Fund plummet more than 50%.

9.    As more fully described below, Defendants have breached their ERISA fiduciary duties of prudence and loyalty to Participants and the ESP Plan by providing and maintaining the BP Stock Fund, a fund that primarily invests in ADSs of BP, during a time when Defendants knew or should have known of the inflated price of BP ADSs and the unacceptable risks in the continued investment and overconcentration of the BP Stock Fund in the ESP Plan.

## II.    JURISDICTION AND VENUE

10.    This action for relief is brought pursuant to the civil enforcement provisions of ERISA § 502 [29 U.S.C. § 1132]. This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1) [29 U.S.C. § 1132(e)(1)].

11.    Venue of this action in the Northern District of Illinois is proper pursuant to ERISA § 502(e)(2) [29 U.S.C. § 1132(e)(2)] and 28 U.S.C. § 1391 because the ESP Plan is administered in this District; some or all of the fiduciary breaches for which relief is sought occurred in this District; and one or more of the Defendants may be found in this District.

4

III.   **PARTIES**

    A.   **The Plaintiff**

    12.   **Plaintiff David M. Humphries.**   At all relevant times, Plaintiff Humphries currently is a Participant within the meaning of ERISA § 3(7) [29 U.S.C. §1002(7)] in the ESP Plan. He is a member and representative of the class of ESP Plan Participants whose accounts under the ESP Plan were invested in the BP Stock Fund and whose accounts suffered losses hereunder.

    13.   Plaintiff, as a Participant in the ESP Plan, is authorized and empowered pursuant to ERISA § 502(a)(2) [29 U.S.C. §1132(a)(2)] to prosecute this action on behalf of the ESP Plan and its Participants and beneficiaries, and to obtain appropriate legal, monetary and equitable relief and remedies under ERISA § 409(a) [29 U.S.C. §1109(a)].

    B.   **The Defendants -- ESP Plan Fiduciaries And The Bases For Their Fiduciary Status**

    14.   **Defendant BP Corporation North America, Inc.** ("BPNA"), a wholly-owned subsidiary of BP America, Inc. ("BP America"), is an Indiana Corporation, with its principal place of business in Warrenville, Illinois.  BPNA is an indirect wholly-owned subsidiary of BP p.l.c. and sponsor of the ESP Plan.  The fiduciary status of BPNA arises, *inter alia*, from the fact that BPNA is the sponsor of the ESP Plan with the responsibility and authority, among other things, to a) appoint the ESP Plan Trustee ("ESP Plan Trustee"), and the individual members of Defendant BP Corporation North America, Inc. Savings Plan Investment Oversight Committee ("Savings Plan Committee"), b) participate in the BP Master Trust for Employees Savings Plans ("BP Master Trust") to monitor their performance and to communicate such information to the Trustee and the Savings Plan as each needed for the proper performance of its duties; and c) act in lieu of the Savings Plan Committee as it deemed appropriate and desirable.  As a result of such express authority, and by virtue of any actions it exercised and functions it undertook in furtherance of such authority during all relevant time frames, BPNA was a fiduciary within the meaning of ERISA § 3(21)(a).

5

15.     **Defendant BP Corporation North America, Inc. Savings Plan Investment Oversight Committee** ("Savings Plan Committee") operates from and maintains its administrative offices in Warrenville, Illinois.  The Savings Plan Committee is identified in the Plan Document as a Named Fiduciary of the ESP Plan.  The Savings Plan Committee had control over the administration of the ESP Plan and the authority to establish and select various investment funds as investment options under the ESP Plan, including the BP Stock Fund which invested in BP ADSs.  The members of the Savings Plan Committee were appointed by and served at the pleasure of the BPNA Board of Directors.

16.     **Defendants: The Savings Plan Committee Members** ("Savings Plan Committee Members") were fiduciaries of the ESP Plan as a result of their membership on the Savings Plan Committee, a fiduciary and the "administrator" of the ESP Plan during all relevant time frames. Under the ESP Plan, the Savings Plan Committee Members fiduciary responsibilities included, without limitation:  (a) the authority to establish and select various investment funds as investment options under the ESP Plan, including the BP Stock Fund which invested in BP ADSs; (b) the responsibility for establishing and carrying out a funding policy consistent with ESP Plan objectives; and, (c) the responsibility for performing the fiduciary functions allocated to the Savings Plan Committee under the ESP Plan, insofar as the Savings Plan Committee Members served as members of and comprised the Savings Plan Committee unless BPNA specified otherwise.  As a result of such express authority, and by virtue of any actions exercised and functions undertaken in furtherance of such authority during all relevant time frames, each of the following Savings Plan Committee Members was a fiduciary within the meaning of ERISA § 3(21)(a):

a.     **Defendant Stephanie C. Adkins** ("Adkins") is or at all relevant times was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP Plan.

b.     **Defendant Richard Dorazil** ("Dorazil") is or at all relevant times was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP

6

Plan. Dorazil also served as Plan Administrator while acting as Vice-President, Total Rewards, Western Hemisphere BP America. Dorazil signed BP's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") during the Class Period in his capacity as the Plan Administrator.

        c.     **Defendant Robert A. Malone** ("Malone") is or at all relevant time was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP Plan. Malone also served as chief executive officer of BP Shipping Limited where he was responsible for the operation of the oil industry's largest oil and natural gas fleet. In June 2006, Malone was appointed Chairman and President of BP America. Less than two months after his appointment, Malone acknowledged to a congressional committee that repeated safety problems had generated questions about BP's credentials and accusations that the company had profited at the expense of employee safety. Malone insisted he was committed to restoring confidence and operational integrity and that he had been "given the authority, the resources and the people" to make it happen.

        d.     **Defendant Lamar McKay** ("McKay") is or at all relevant times was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP Plan. McKay also is currently the Chairman and President of BP America and Chief Representative of BP in the United States. Mr. McKay also is a member of the BP p.l.c. Executive Management Team and has led BP's Special Projects Team since early 2008. According to McKay's testimony before Congress on May 11, 2010, he is BP's lead representative in the U.S. and is responsible for broad oversight and connectivity across all of BP's U.S. based operations.

        e.     **Defendant Neil Shaw** ("Shaw") is or at all relevant times was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP Plan. From 2007-2009, Shaw served as BP's senior vice president in charge of BP's Gulf of Mexico Division.

f.      **Defendant Thomas L. Taylor** ("Taylor") is or at all relevant times was a member of the Savings Plan Committee, and thus was a fiduciary under ERISA of the ESP Plan.

g.      **Defendant Gregory T. Williamson** ("Williamson") is or at all relevant times was a member of the Savings Plan Committee, and thus a fiduciary under ERISA of the ESP Plan. Williamson served as Director of Trust Investments for BP America during the Class Period. His duties included supervising and managing U.S. defined benefit plans and 401(k) plans, both based in Warrenville, Illinois. Williamson was formerly BP America's senior investment manager. He also served as the Secretary of the Savings Plan Committee during the Class Period.

17.      **Defendant BP Corporation North America, Inc.'s Board of Directors** ("BPNA Board") was a fiduciary under the ESP Plan because it had the authority to appoint, remove and appoint successors to the Savings Plan Committee, to monitor their performances, and to communicate such information as each needs for the proper performance of its duties.

18.      BPNA, the BPNA Board, the Savings Plan Committee, and the Members of the Savings Plan Committee are collectively referred to herein as the **"ESP Plan Fiduciaries."**

19.      **Defendants ESP Plan Fiduciaries DOES 1-20** are fiduciaries of the ESP Plan whose exact identities will be ascertained through discovery. They may include, but are not limited to, members of the Savings Plan Committee, if appointed under the terms of the ESP Plan; additional members of the Savings Plan Committee during relevant time-frames; individual BPNA Board Members; and other ESP Plan Fiduciaries as they are identified.

## IV.   THE ESP PLAN: STRUCTURE AND PLAN TERMS

20.      At all relevant times, the ESP Plan is and was an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A) [29 U.S.C. §1002(2)(A)]. As set forth in the Form 11-K filed with the SEC for the period ending December 31, 2009, the ESP Plan was created July 1, 1955 and is sponsored by BPNA. During the time the fiduciary breaches complained of herein

8

occurred, approximately 30% of the ESP Plan assets were invested in BP Stock Fund, which is comprised almost entirely of BP ADSs.

21.     The purpose of the ESP Plan is to "encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement." ESP Plan Form 11-K filed June 16, 2010.

22.     Fidelity Investments Institutional Services Company, Inc. is the record keeper for the ESP Plan.  The ESP Plan's assets, pursuant to ERISA § 403(a) [29 U.S.C. § 1103(a)], are held in trust by State Street Bank and Trust Company ("SSBT"), the Trustee of the BP Master Trust Fund created under the Trust Agreement between SSBT and BPNA.  SSBT served as the Trustee of the ESP Plan and Investment Manager of the BP Stock Fund during the Class Period. The ESP Plan Document provides that contributions are to be paid over to the Trustee to be held in the Trust Fund and invested in accordance with the terms of the ESP Plan and the Trust.  ESP Plan Form 11-K filed June 16, 2010.

23.     BP's full time, part-time, occasional and temporary employees are eligible to participate in the ESP Plan.  BP's employees may enroll in the ESP Plan immediately after their date of hire.  Participants in the ESP Plan may contribute to of to 80% (100% prior to May 1, 2009) of their qualified pay, subject to statutory limits.  ESP Plan Form 11-K filed June 16, 2010.

24.     At all relevant times, BPNA and the Savings Plan Committee were and are Named Fiduciaries of the ESP Plan, within the meaning of ERISA § 402(a)(2) [29 U.S.C. §1102(a)(2)].  ESP Plan Form 11-K filed June 16, 2010.

25.     At all relevant times, the ESP Plan matched employees' contributions to the ESP Plan.  The ESP Plan matched 100% of the employee contributions up to 7% of eligible pay.  ESP Plan, Form 11-K filed June 16, 2010.

26.     In 2009, the ESP Plan had approximately 39,000 participants and $7 billion in assets.  The top three investment holdings were: (1) BP Common Stock Fund (32%); (2) Northern Trust S&P 500 Index (6%), and (3) Dwight Target 2 Fund (4%).

9

27.     BPNA and the BPNA Board each had and have the authority to, *inter alia*, appoint the Savings Plan Committee Members and monitor each of their performances. BPNA and the BPNA Board were also required to communicate such information to the Master Trustee and the Savings Plan Committee for the proper performance of their duties. BPNA, as the ESP Plan's Controlling Company, was given the authority to act in lieu of the Savings Plan Committee as it deemed appropriate.

28.     The Savings Plan Committee (and, thus, each of the Defendants designated as a Savings Plan Committee Member) is charged under the ESP Plan with fulfilling the duties of Plan Administrator as set forth in ERISA §3(16) with complete control of the administration of the Plan. The Savings Plan Committee Members were and are appointed by and served at the pleasure of the BPNA Board. In addition, the Savings Plan Committee Members named as Defendants herein were and are conferred with the authority to perform all additional fiduciary functions allocated under the terms of the ESP Plan.

29.     The Savings Plan Committee and Savings Plan Committee Members had the authority to direct the Master Trustee to establish investment funds and modify the investment mix of any of the investment funds specified in the ESP Plan, including the BP Stock Fund, without any amendment to the ESP Plan.

30.     By virtue of the authority conferred under the terms of the ESP Plan, and by such actions performed in furtherance of such authority, BPNA, the BPNA Board, the Savings Plan Committee, and the Savings Plan Committee Members were and are fiduciaries of the ESP Plan as defined under ERISA § 3(21)(a).

31.     Under the ESP Plan, the BP Stock Fund was and is classified as a "unitized fund investing primarily in BP ADSs." In fact, the BP Stock Fund consists almost entirely of BP ADSs. The BP Stock Fund seeks to match the investment return of BP ADSs, which are securities created to allow easier holding and trading in the United States of equity interests in BP, the English publicly-held company. Each BP ADS consists of six BP ordinary shares.

10

32.     ERISA requires Defendants, as Plan fiduciaries, to furnish accurate and complete information to Participants.  ERISA § 101 [29 U.S.C. § 1021] requires the Plan Administrator to furnish Summary Plan Descriptions ("SPDs") to Participants.  The ESP Plan Document, the SPD and the ESP's Investment Option Guide (and updates), a supplement to the SPD in effect during the Class Period, incorporate by reference certain information filed by BP, thereby making such SEC filings fiduciary communications with the Participants.

## V.     THE LAW UNDER ERISA

33.     ERISA § 502(a)(2) [29 U.S.C. §1132(a)(2)] provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409 [29 U.S.C. §1109].

34.     ERISA § 409(a) [29 U.S.C. §1109(a)], entitled, "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

35.     ERISA § 404(a)(1)(A) and (B) [29 U.S.C. § 1104(a)(1)(A) and (B)] provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

36.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence*. They entail, among other things,

a.     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including employer securities, to ensure that each investment is a suitable option for the plan.

11

b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

c.    A duty to disclose and inform, which encompasses (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

37.    Furthermore, ERISA fiduciary duties are the "highest known to the law," and the ERISA duty requiring the prudent investment of plan assets is judged against that of a prudent expert, a standard markedly different from and higher than the "business judgment" rule.

38.    Defendants are not entitled to a "presumption of prudence" with respect to the investment in employer stock in the ESP Plan. *See In re General Growth Properties, Inc.*, 2010 WL 1840245 (N.D. Ill. 2010); *Lingis v. Motorola, Inc.* 649 F.Supp.2d 861, 879 (N.D. Ill. 2009).

39.    ERISA § 404(a)(1)(D) [29 U.S.C. § 1104(a)(1)(D)] provides in pertinent part that a fiduciary shall discharge his duties with respect to a plan in accordance with the documents and instruments governing the plan.

40.    ERISA § 405(a) [29 U.S.C. § 1105(a)], entitled "Liability for breach by co-fiduciary," provides, in pertinent part, that in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with ERISA § 404(a)(1) [29 U.S.C. §1104(a)(1)], in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

12

41.     Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the ESP Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## VI.    THE ESP PLAN FIDUCIARIES' BREACH OF DUTIES

42.     As more specifically set forth below, the ESP Plan Fiduciaries breached fiduciary duties in violation of ERISA by, *inter alia*, causing and/or permitting the ESP Plan to invest in the BP Stock Fund and BP ADSs during the time period from June 30, 2005 through June 1, 2010, when they knew or should have known that BP engaged in a scheme of concealment and/or the provision of materially misleading and false information about BP's and its subsidiaries' safety and maintenance programs, reporting of safety incidents, and disaster recovery programs.

43.     The duty of loyalty required Defendants, as fiduciaries, to truthfully disclose information regarding the ESP Plan and ESP Plan assets, to refrain from misleading Participants, and to refrain from concealing material information on investment options. Defendants knew or should have known of the undisclosed risks of investing in the BP Stock Fund, which were magnified given the high concentration (30%) of the ESP Plan's funds in the BP Stock Fund and BP ADSs.

44.     The ESP Plan Fiduciaries failed to take steps, such as capping or reducing the proportion of investment in company shares unless and until BP adequately addressed systemic safety issues and blowing the whistle when BP failed to address such systemic safety issues, that would have eliminated or mitigated harm to Participants and the ESP Plan.

45.     While concealing material information and BP's true financial condition, Defendants sat by idly as Participants invested their retirement savings into the BP Stock Fund at prices that were greater than fair market value during a time in which the continued investment in the BP Stock Fund and BP ADSs was not prudent.

13

## VII.   CLASS ACTION ALLEGATIONS

46.    This action is brought to recover losses to the ESP Plan and the Participants in the Plan arising from breaches of fiduciary duty by the respective Plan fiduciaries on behalf of Plan Participants.

47.    The ESP Plan Class is defined as:

All persons who were participants in or beneficiaries of the ESP Plan at any time during the Class Period, between June 30, 2005 to June 1, 2010, whose accounts included units of the BP Stock Fund.  Excluded from the Class are the Defendants and members of the Defendants' immediate families, any entity in which a Defendant has a controlling interest and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest, or assigns.

48.    Plaintiff seeks certification of the ESP Plan Class, and such Class satisfies the requirements for class certification as set forth below:

a.    **Numerosity**: The ESP Plan Class satisfies the numerosity requirements of Fed.R.Civ.P. 23(a) because it is composed of, at a minimum, thousands of persons in numerous and various locations throughout the United States and the number of class members is so large that joinder of all its members is impracticable.

b.    **Commonality**: There are common questions of fact and law common to the ESP Plan Class.  These questions include:

i.    Whether as a result of materially misleading and material omissions of fact (before and during the Class Period) regarding BP's and its related entities' safety and maintenance program, about which the ESP Plan Fiduciaries either knew or should have known, that the price of shares of the BP Stock Fund (based upon the value of BP ADSs), from June 30, 2005 through June 1, 2010 was artificially inflated and was an imprudent investment;

ii.    Whether the shares of BP Stock Fund acquired by the ESP Plan between June 30, 2005 and June 1, 2010 were acquired for greater than adequate consideration because the price of such shares was artificially inflated;

14

iii.     Whether the ESP Plan Fiduciaries breached their fiduciary obligations to the ESP Plan by causing the ESP Plan to continue to offer the BP Stock Fund as an investment alternative for the investment of new assets of the ESP Plan at a time when the ESP Plan was overly-concentrated in the BP Stock Fund and the fiduciaries knew or should have known that shares of the BP Stock Fund were inflated and were not a prudent investment for the ESP Plan;

iv.     Whether the ESP Plan Fiduciaries breached their fiduciary obligations to the ESP Plan by failing to disclose to the participants of the ESP Plan that the price of the BP Stock Fund was inflated based upon BP's and its related entities' material omissions regarding their safety program and procedures and disaster recovery plans.

v.     Whether BPNA and the BPNA Board breached their fiduciary obligations to the ESP Plan by failing to monitor the actions of the Savings Plan Committee and the Members of the Savings Plan Committee;

vi.     Whether BPNA and the BPNA Board breached their fiduciary obligations to the ESP Plan by failing to prevent the Savings Plan Committee and the Members of the Savings Plan Committee from offering the shares of the BP Stock Fund as an investment option at a time when new shares of stock of the BP Stock Fund were inflated in price and were not a prudent investment for the ESP Plan;

vii.     Whether BPNA and the BPNA Board breached their fiduciary obligations to the ESP Plan by failing to communicate such information to the Trustee, the Savings Plan Committee and the Members of the Savings Plan Committee as needed for the proper performance of their respective duties; and

viii.     Whether as a result of fiduciary breaches engaged in by the ESP Plan Fiduciaries, the ESP Plan and its Participants suffered losses.

c.     **Typicality**: The claims of Representative Plaintiff Humphries are typical of the claims of the members of the ESP Plan Class.

0093040/001/ 469664v01

     d.    **Adequacy**: Plaintiff Humphries is an adequate representative and will protect the members of the ESP Plan Class.  Plaintiff Humphries is represented by the law firms of Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, Ajamie LLP, and Novack and Macey LLP.  All of the counsel are experienced in class action and ERISA litigation.  Plaintiff does not have interests which are antagonistic or in conflict with the interests of the ESP Plan Class which he seeks to represent.  He intends to vigorously pursue this action.

     e.    **Other matters**: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy related to the ESP Plan Class because, among other things, joinder of all members of the ESP Plan Class is impracticable.  As the losses suffered by some of the individual members of the ESP Plan Class may be relatively small, the expense and burden of individual litigation makes it impracticable for individual members of the ESP Plan Class to enforce their rights.  Moreover, Defendants were required to treat all Class Members similarly as each Class Member was a plan participant under written plan documents and ERISA which imposes uniform standards of conduct on Defendants each of whom was a fiduciary of the ESP Plan.  Plaintiff is unaware of any difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

    49.    **The ESP Plan Class May be Certified under Rule 23(b)**.

     a.    **Rule 23(b)(1)**.  As an ERISA breach of fiduciary duty action, this is a classic Rule 23(b)(1) class action, insofar as the prosecution of separate actions by individual members of the ESP Plan Class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants opposing the Class, or (B) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

16

b.      **Rule 23(b)(2) and/or (3)**.  This action is also maintainable as a class action for the ESP Plan Class under the subsections Rule 23(b)(2) and/or (3), insofar as the Defendants have acted or refused to act on grounds generally applicable to the ESP Plan Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the ESP Plan Class, and questions of law common to the members of the ESP Plan Class predominate over any questions affecting only individual plan participants, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## VIII.   BP'S SCHEME TO CONCEAL MATERIAL INFORMATION RESULTING IN THE ARTIFICIAL INFLATION OF BP ADSs AND THE BP STOCK FUND

### A.      Introduction

50.      The Class Period begins on June 30, 2005.  On this day, BP filed its Form 20-F Annual report with the SEC.  In the Form 20-F, BP pledged that BP had implemented protocols to ensure regulatory and safety compliance by all employees.  BP further promised that it would conduct its activities in such a manner that there would be little to no damage to the environment. BP further stated it would ensure compliance with all applicable regulations and its employees were required to comply with the BP health, safety and environmental policies and associated standards and expectations.  BP also noted that the Gulf of Mexico was one of its new profit centers and the largest area of growth in the United States.  BP's Form 20-F filed with the SEC on June 30, 2006 made similar proclamations of commitment to safety and compliance with regulations.

51.      By 2007, BP aggressively sought to continue to improve its public image and artificially increase the value of its share price.  In 2007, recognizing BP's poor safety history, BP CEO Anthony Hayward ("CEO Hayward") launched a campaign to convince the market that the company had changed its ways and was conducting its operations in a safe and reliable manner and that the public could be assured BP was taking all necessary precautions to prevent environmental disasters.  This action was critical to BP's survival because BP had a tarnished reputation from a string of environmental disasters.

17

52.     At the same time, BP began to tout new areas of oil exploration and production, such as the deepwater Gulf of Mexico and its ability to extract and produce oil in an environmentally friendly and safe manner that posed little risk to the company, its employees and the public.

53.     Plaintiff and Participants in the ESP Plan, relying on BP's misstatements and omissions regarding BP's ability to derive revenue and profits from its operations in a safe and reliable manner, in particular from the Gulf of Mexico, invested and held substantial funds in the BP Stock Fund and BP ADSs.

54.     In its 2009 Annual Form 20-F, filed on March 5, 2010, BP stated in a section entitled "Safety" that "[g]ood progress is being made on underpinning improved safety performance in 2009.  Throughout the year, we continued to focus on training and enhancing procedures across the organization."  BP touted the "continued success of our Gulf of Mexico deepwater operations."

55.     In that 20-F Report, while addressing its oil exploration and production operations, including highlighting its deepwater Gulf of Mexico operations, BP stated: "In Exploration and Production, safety, both personal and process, remains our highest priority."

56.     While focusing on marketing itself as being able to achieve substantial revenue growth from new oil exploration in the Gulf of Mexico, BP misled Plaintiff and Participants that it was conducting the operations in a safe manner.  Plaintiff and Participants had no reason to suspect that BP's approach to safety in its deepwater Gulf of Mexico operations was so below the standard of care that it publically claimed to follow that an accident similar to the Deepwater Horizon was inevitable.  This is the type of material information that should have materially affected ERISA fiduciary decision-making, especially in light of the high costs of a catastrophic disaster.

57.     Despite its claims about putting "safety first," BP recklessly failed to implement appropriate safety measures.  Safety and maintenance problems were endemic throughout BP, including on the Deepwater Horizon.  Moreover, additional safety mechanisms, technologies,

18

and precautions were known and available but BP, in an effort to reduce costs, chose not to employ them on the Deepwater Horizon. BP's concealment and misleading statements about its safety programs and disaster recovery plans caused BP ADSs, and thus shares of the BP Stock Fund, to be inflated and not a prudent investment.

**B.      2005-2008: BP Falsely Represents That Past Mistakes Have Been Corrected.**

**1.      2005: Texas City Disaster**

58.      The BP Texas City Refinery is the third largest refinery in the United States. On March 23, 2005, at 1:20 pm, the Refinery suffered what was (before the Deepwater Horizon disaster) one of the worst industrial disasters in recent U.S. history. An explosion at the refinery killed 15 people, injured another 180 and resulted in financial losses exceeding $1.5 billion. The blast occurred during the startup of an isomerization unit (ISOM) when a raffinate splitter tower was overfilled; pressure relief devices opened, resulting in a flammable liquid geyser from a blow down stack that was not equipped with a flare. The release of the flammables caused an explosion and fire. A shelter-in-place order was issued that required 43,000 people to remain indoors and houses were damaged from as far as three-quarters of a mile from the refinery.

59.      After the Texas City refinery tragedy, the U.S. Chemical Safety and Hazard Investigation Board ("CSB") investigated BP's safety performance at Texas City. According to the CSB's final report, the Texas City disaster was caused by organizational and safety deficiencies at all levels of BP. Warning signs of a possible disaster were present for several years, but company officials did not intervene to prevent a catastrophe.

60.      The extent of the significant safety deficiencies were further revealed when the refinery experienced two additional serious incidents just months after the March 2005 disaster. In one incident, a pipe failure caused approximately $30 million in damage and in the other, there was approximately $2 million in property loss. In each incident, community shelter-in-place orders were issued.

61.      The CSB report states: "Simply targeting the mistakes of BP's operators and supervisors misses the underlying and significant cultural, human factors, and organizational

19

causes of that disaster that have a greater preventative impact.  One underlying cause was that BP used inadequate methods to measure safety conditions at Texas City."

62.     Among its key organizational findings, the CSB final report found that cost-cutting, failure to invest and production pressures from BP Group executive managers impaired the process safety performance at Texas City.  The BP Board of Directors did not provide effective oversight of BP's safety culture and major accident prevention programs.  The Board did not have a member responsible for assessing and verifying the performance of BP's major accident hazard prevention programs.

63.     After the explosion at Texas City, OSHA uncovered 301 "egregious willful" violations for which BP paid a $21 million fine, the largest ever issued by OSHA.  Prior to OSHA issuing the citations, the refinery had two additional serious incidents.  Despite the large number of violations and the two additional serious incidents, BP convinced OSHA it did not need to conduct a thorough inspection of any of the other 29 process units at the Texas City refinery.

64.     Reliance on the low personal injury rate at the Texas City refinery as a safety indicator failed to provide a true picture of process safety performance and the health of the safety culture.  Deficiencies in BP's mechanical integrity program resulted in the "run to failure" of process equipment at Texas City.

65.     The Texas City refinery had a "check the box" mentality, meaning the personnel would complete paperwork and check off on the safety policy and procedural requirements without actually doing the checks and meeting the requirements.  The Texas City refinery also lacked a reporting and learning culture.  The personnel were not encouraged to report safety problems and some even feared retaliation for doing so.  Therefore, the lessons that could have been learned from the incidents were never learned because the incidents were never acted upon.  At the same time, BP assured the public and ESP Plan Participants, after the incidents, that BP had acted upon (and learned from) these mistakes.

20

### 2.   BP Issues An Incident Investigation Report.

66.    On December 9, 2005, BP issued its final incident investigation report on the Texas City disaster.  In that report, BP claimed to improve safety not only at that refinery but throughout all of its operations.  Ross Pillar, president of BP Products North America, Inc., stated that "[t]he report clearly describes the underlying causes and management system failures which contributed to the worst tragedy in BP's recent history.  We accept the findings, and we are working to make Texas City a complex that attains the highest levels of safety, reliability and environmental performance."

### 3.   After The Texas City Disaster, BP Makes False Statements And Omits Material Facts Regarding Safety Improvements.

67.    After the Texas City refinery incident, BP followed the recommendation of the CSB and formed the BP U.S. Refinery Independent Safety Review Panel to conduct a thorough review of the company's corporate safety culture, safety management systems, and corporate safety oversight.  The Panel included such luminaries as James A. Baker, III, former U.S. Secretary of State, and former Senator Thomas Slade Gorton III (R-Washington).

68.    In January 2007, the Panel issued a report, sometimes referred to as the "Baker Report," which stated that "BP's Group requirements are intended to ensure a consistent Group-wide effort to achieve BP's stated commitment toward 'no accidents, no harm to people, and no damage to the environment.'"

69.    After the Baker Report was released, Lord John Brown, the former CEO of BP stated:  "We will use this report to enhance and continue the substantial effort already underway to improve safety culture and process safety management at our facilities.  I intend to ensure BP becomes an industry leader in process safety management and performance."

### 4.   Cost And Consequences To BP Of The Texas City Disaster

70.    As a result of the Texas City disaster, BP pled guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency.  BP officers signed a settlement agreement with federal safety inspectors vowing to institute improvements.  In 2009, OSHA imposed an $87 million fine – the largest in its history – on BP for failing to

21

correct the safety violations at the Texas City plant.  OSHA declared that BP has a "serious systematic safety problem."

### 5.    2006: Oil Leakage in Prudhoe Bay, Alaska

71.    In 2006, less than one year after the Texas City disaster, BP had to shut down part of its Prudhoe Bay oil field in Alaska after oil leaked from a corroded pipeline.  BP had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was hopelessly corroded.  BP was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines.

72.    On October 25, 2007, a BP subsidiary, BP Exploration Alaska, Inc., pled guilty to criminal violations of the Clean Water Act and was sentenced to three years probation.  A Congressional committee later determined that BP had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations.  The Prudhoe Bay incident and the Texas City disaster led to the resignation under fire of John Browne, BP's former CEO.  BP promised again that it would change and improve on its safety.

### 6.    BP's Annual Filings On Form 20-F Tout Safety Measures Taken In Response To Past Incidents.

73.    BP filed annual reports or Form 20-Fs with the SEC.  In BP's 2007 Form 20-F submission, it made the following representations regarding safety and risk management: "[T]hroughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007. . .  We have made material progress throughout the group across all of the panels 10 recommendations."

74.    The Form 20-F report also stated: "We have continued to improve the way in which we seek to ensure our operations maintain compliance with health and safety laws and regulations.  A project to establish a consistent compliance management framework has been under way in the US during the past two years and is expected to be completed globally by the end of 2008."  The report also stated: "In combination with our efforts to improve process

22

safety, we have continued to strive for excellence in occupational health and safety. This is in line with our aspiration of no accidents, no harm to people and no damage to the environment."

### 7.   CEO Hayward's Empty Promises of Safety First and Commitment To Change

75.     When Hayward took office as BP CEO in 2007, he promised to change BP's culture, with a renewed commitment to safety. Hayward represented that his first priority was "focusing like a laser on safe and reliable operations."

76.     His promise was empty. Hayward led BP on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures. While aggressively seeking to grow and expand, BP implemented "draconian" methods of keeping costs down, and failed to provide prudent and accepted safety measures to prevent a tragedy like the Deepwater Horizon explosion. BP simply ignored safety and environmental concerns.

77.     In 2007, BP was cited for inadequately training employees in well control in a scenario that was very similar to what transpired on the Deepwater Horizon on April 20, 2010. In addition, the Deepwater Horizon was badly burned by an accidental fire in 2005 while under contract with BP. In May 2008, the accidental opening of a valve flooded the Deepwater Horizon with seawater, causing substantial damage. This information was not disclosed to Participants in the ESP Plan in any of BP's public statements.

78.     A rule change enacted in 2008 by the U.S. Minerals Management Service ("MMS") allowed BP to avoid filing a plan specifically for handling a major spill from an uncontrolled blowout at its Deepwater Horizon project – exactly the kind of disaster which is now unfolding in the Gulf of Mexico. According to reports, improper benefits were given by BP to the Interior Department so that BP could cut costs in its oil drilling and production operations in the Gulf of Mexico.

79.     The MMS, which is an arm of the Interior Department, oversees the United States' natural gas, oil and other mineral resources. In 2009, when the MMS proposed a rule that

23

would have required companies to have their safety and environmental management programs audited once every three years, BP lodged a formal objection.

80.     Moreover, BP actively opposed the MMS's rules requiring oil rig lessees and operators to develop and audit their own safety and emergency management plans, insisting that voluntary compliance would suffice and that BP would put safety at the forefront of its operations.  In 2009, BP spent $16 million lobbying the federal government on a wide variety of issues, including encouraging the government to remove restrictions on drilling on the continental shelf.  BP fought for these government changes despite its history of spills and explosions and BP's knowledge of the high risks involved in such drilling.

## IX.    BP'S FAILURE TO DISCLOSE MATERIAL INFORMATION DURING THE CLASS PERIOD

81.     In March 2009, BP identified its operations in the Gulf of Mexico as one of its primary economic drivers, noting the fact that it was one of the largest deepwater operators in the world.  At the same time, BP failed to disclose that its Gulf of Mexico operations were exceedingly risky and that the Company had deficient safety protocols in place to deal with potential disasters.

82.     In fact, by March 2009, already a month after the Deepwater Horizon rig began drilling in the Gulf, BP had not yet contemplated a blowout scenario and showed no signs of doing so.  According to BP's Initial Exploration Plan, made publicly available around March 2009, "A scenario for a potential blowout of the well from which BP would expect to have the highest volume of liquid hydrocarbons is not required for the operations proposed in this EP." Nevertheless, BP fraudulently represented that it had the capability to respond "to the maximum extent practicable."  In what has turned out to be a ludicrously inaccurate representation in its Initial Exploration Plan, not only did BP falsely claim it could respond to 162,000 barrels of crude oil per day at the Macondo well, it further claimed that it could respond to 300,000 barrels per day if need be.

83.     The Plaintiff, Participants, and general public had no way of knowing that contrary to these wildly inaccurate representations, BP could not even reliably respond to its

24

initial Gulf oil disaster estimate of 1,000 barrels per day, let alone the current estimates of 35,000 to 65,000 barrels per day. Since the Deepwater Horizon spill began, CEO Hayward has admitted facts establishing that BP's representations to the public were disastrously false, telling *The Financial Times*, for example, that it was "an entirely fair criticism" to say the company had not been fully prepared for a deepwater oil leak. Continuing, Hayward said, "What is undoubtedly true is that we did not have the tools you would want in your tool-kit."

84.    BP's early failure to contemplate a blowout scenario was done in spite of the fact that internal documents show that in March, after problems on the rig that included drilling mud falling into the formation, sudden gas releases known as "kicks," and a pipe falling into the well, BP officials informed federal regulators that they were struggling with a loss of "well control."

85.    Meanwhile, BP continued making materially false and misleading statements to the public about its rigorous attention to safety. On March 4, 2009, for example, BP filed with the SEC its 2008 Form 20-F, which stated, like its other Form 20-Fs, in a section entitled "Safety" that "[g]ood progress is being made on underpinning improved safety performance in 2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization." BP also touted the "continued success of our Gulf of Mexico deepwater operations."

86.    The 2008 Form 20-F also stated: "We remain fully committed to becoming a recognized industry leader in process safety management and are working to achieve this. We have taken a range of steps, including acting on the recommendations from both the panel and those within the first annual report of the independent expert."

87.    In fact, the independent expert report explained: "Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the

group chief executive that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008."

88.     On March 10, 2009, BP filed an Initial Exploration Plan for Mississippi Canyon 252. The Initial Exploration Plan detailed the safety mechanisms that BP said it intended to implement. This document was false and misleading as it failed to appropriately and accurately detail the true risks and dangers of this operation and failed to disclose the fact that BP had disregarded known risks relating to the operation of the Deepwater Horizon.

89.     Significantly, despite its public pronouncements to the contrary, BP's general disregard for safety became apparent upon review of its regional spill plan for Gulf of Mexico operations following the Deepwater Horizon incident. The plan appears to have cut and pasted material indiscriminately from an Alaska plan, referencing walruses, seat otters, and sea lions, creatures that exist in Alaska, not the Gulf of Mexico. Likewise, the plan referenced Bob Lutz, purportedly a wildlife expert at the University of Miami, to serve as the liaison for wildlife conservation in the event of an oil spill. Mr. Lutz, however, had passed away four years before the plan was approved. Furthermore, the plan identified the Marine Spill Response Corp. as a resource in the event of a spill. The hyperlink to Marine Spill Response Corp., however, directed one to a Japanese language website.

90.     The risks of the Deepwater Horizon operations were heightened around June 2009, when BP engineers expressed concerns that the metal casing the company wanted to use might collapse under high pressure. In a confidential internal report, Mark Hafle, a senior drilling engineer at BP, stated: "This would certainly be a worst-case scenario . . . However, I have seen it happen so I know it can occur." In spite of this warning, however, BP went ahead with the casing, but only after getting special permission from BP colleagues because it violated the company's safety policies and design standards. The internal reports do not explain why BP allowed for an exception, though they reveal that the company knew the casing was the riskier of the two options. This information, critically important to the safety of the BP employees

26

working on the Deepwater Horizon and to the health of the company generally, was never disclosed to Plaintiff, the Participants, or the general public.

91.     Worse still, BP's concerns about the casing did not dissipate after Mr. Hafle's 2009 report. An internal document reveals that in April 2010, BP engineers concluded that the casing was "unlikely to be a successful cement job," referring to how the casing would be sealed to prevent gases from escaping up the well. The document further reveals that the plan for casing the well was "unable to fulfill MMS regulations." Inexplicably, a later version of this document simply revised the conclusion to state the opposite, promising, "It is possible to obtain a successful cement job" and "It is possible to fulfill MMS regulations."

92.     On November 19, 2009, David Rainey, Vice President for Gulf of Mexico Exploration for BP America, appeared before the Senate Energy and Natural Resources Committee. He testified that advances in technology had enabled the industry to reduce the occurrence of oil spills and other environmental consequences of offshore drilling. Rainey also stated that developments over the last 50 years have made it easier to protect the environment. While Rainey acknowledged the general risks of drilling for oil in the Gulf of Mexico, he neglected to mention that BP had not implemented adequate safety provisions and was highly exposed to operational risks in the Gulf of Mexico.

93.     Rainey provided a written statement to the Senate Energy and Natural Resources Committee. With respect to safety, Rained explained: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents."

94.     Rainey's statement further provided specific information regarding the complexities of oil operations in the Gulf of Mexico, but failed to include material facts relating to BP's inadequate safety protocols.

95.     Rainey's representations were false and misleading. While explaining the successes and profit potential of BP's Gulf of Mexico operations, Rainey omitted from his public

0093040/001/ 469664v01

and widely disseminated remarks any acknowledgement of the true risks and dangers of these operations. Most importantly, Rainey omitted the fact that BP's safety protocols were woefully inadequate to protect the public, its employees and the environment from an incident like the Deepwater Horizon disaster.

96.     On February 26, 2010, BP issued its 2009 Annual Review. The Annual Review included a letter from Chairman of the Board Carl-Henric Svanberg, stating: "Risk remains a key issue for every business, but at BP it is fundamental to what we do. We operate at the frontiers of the energy industry, an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make - these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, but the board will strive to set expectations of how risk is managed and remain vigilant on oversight."

97.     This statement, which omitted the fact that BP sacrificed the management of risk to maximize profit, was misleading. Rather than effectively manage risk, BP was prepared to put its employees, the public and the environment at substantial risk to save money by, for example, choosing cheaper design specifications for the wellcasing and well pipe, against the recommendations of such contractors such as Halliburton Company. If BP had truly been willing to put safety first, it would have complied with safety standards and reduced known safety risks to prevent a disaster like the Deepwater Horizon incident.

98.     In the 2009 Annual Review, CEO Hayward wrote: "Despite these difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations."

99.     CEO Hayward further touted BP's Gulf of Mexico operations as the largest producer and leading resource holder in the deepwater Gulf of Mexico. He reassured investors that risks were being handled appropriately. He stated: "BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to

28

maximize returns over the long term. We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do. This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."

100.   In a section entitled "Sustaining momentum and growth," BP acknowledged that its safety protocols are material to investors by including a separate section on safety entitled "Safety, reliability, compliance and continuous improvement." That section stated: "Safe, reliable and compliant operations remain the group's first priority."

101.   These representations concealed the fact that BP had been operating in an unsafe manner, particularly with respect to its deepwater Gulf of Mexico operations critical to BP's financial results. The truth was that safety was not BP's first priority. Rather, BP's failure to implement and enforce appropriate safety measures made a costly and deadly incident like the Deepwater Horizon a virtual inevitability.

102.   In fact, BP concealed the fact that its engineers predicted a catastrophic disaster of this nature. According to recent reports, BP also owned the world's deepest moored oil and gas production rig, known as Atlantis, that operated with "hundreds if not thousands" of incomplete and inaccurate engineering documents, which one BP project manager described as a "fundamental violation" of basic safety regulations that could "lead to catastrophic operator errors." In addition to these statements, made in an August 15, 2008 e-mail that was never revealed to the public, the project manager further stated that, "The current procedures are out of date." In discussing whether or not to provide incomplete documentation, the project manager stated: "This could lead to catastrophic operator errors due to their assuming the drawing is correct."

103.   Kenneth Abbott, a BP consultant hired to advise on operations on the Atlantis oil rig, told BP that critical blueprints and drawings needed to safely operate the Atlantis had not been reviewed or approved by BP engineers. According to Mr. Abbott, 89% to 95% of the blueprints that are critical to BP's operation of the Atlantis and further should have been attained

29

*before* beginning operations had never been reviewed or approved. In the six months that Mr. Abbott worked for BP, his vigilant efforts to remedy the situation went unheeded and made him ever increasingly "unpopular." Mr. Abbott's concerns were never revealed to Participants in the ESP Plan. This information is material since accidents, such as the Texas City and Deepwater Horizon disasters, have a significant impact on BP.

104.    After BP failed to remedy the gross lack of blueprints and drawings, Mr. Abbott relentlessly worked to remedy the situation. In early February 2009, Mr. Abbott made a complaint about the situation to the BP Office of the Ombudsman, resulting in a number of meetings, telephone calls and written communications. On March 9, 2009, Mr. Abbott contacted Earl Devaney, Inspector General of the Department of the Interior ("DOI"), informing him of BP's unsafe conditions. This communication resulted only in a DOI employee informing Mr. Abbott that he could not be helped as he was not a government employee. Thus, Mr. Abbott filed a complaint on April 21, 2009 in the Southern District of Texas, alleging that BP operated in violation of the statutes and regulations that govern oil and gas operations in the Gulf. This complaint was sealed and unavailable to Plaintiff, the Participants, or the general public until May 12, 2010, when the court granted a motion filed by the government to unseal the pleadings in that case.

105.    Even in the aftermath of the Deepwater Horizon, BP publically has stated that their other operations remain safe and that Deepwater Horizon was merely an isolated incident. From the evidence revealed to date, however, BP's push for speed and cost savings over safety were the primary cause of the Deepwater Horizon explosion and those same risks apply with equal force to BP's other operations in the Gulf. BP's representation that safety is the most important priority was false. It appears now that inadequate safety mechanisms at the Atlantis oil rig make another catastrophic incident likely. The Atlantis, operating a short distance away from the Deepwater Horizon, intends to install a total of sixteen oil wells. An accident at the Atlantis, however, would dwarf the catastrophe of the Deepwater Horizon. Yet, until the Deepwater Horizon incident, all of this information had been concealed by BP.

30

106.    In February of 2010, two months before the Deepwater Horizon disaster, 19 members of Congress called on the agency that oversees offshore oil drilling to investigate Abbott's complaints about the BP-owned Atlantis, which was stationed in 7,000 feet of water more than 150 miles south of New Orleans.  According to the Associated Press, the independent firm hired by BP substantiated the complaints in 2009 and found that the giant petroleum company was violating its own policies by not having completed engineering documents on board the Atlantis when it began operating in 2007.  Stanley Sporkin, a former federal judge whose firm served as BP's ombudsman, said that the allegation "was substantiated, and that's it." This study was never disclosed to Participants and was not revealed until after the Deepwater Horizon disaster.

107.    In January of 2010, Karen Westall, an attorney for BP, wrote a letter to Congress saying the company was compliant with all federal requirements and the Atlantis had been operating so safely that it received an MMS award.  This statement was false and misleading.

108.    On March 5, 2010, BP issued its 2009 Form 20-F Annual Report.  BP stated in a section entitled "Outlook" that "Our priorities remain the same - safety, people and performance focusing on the delivery of safe, reliable and efficient operations.  In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our priorities of safe, reliable and efficient operations."

109.    Again, these representations were false and misleading.  While promoting the Gulf of Mexico as one of the critical areas of growth, BP omitted the fact that its operations in the Gulf of Mexico were unsafe and that it conducted operations in the Gulf of Mexico in a low-cost, high risk manner.  The truth, as revealed by the cascade of systematic failures that resulted in the Deepwater Horizon disaster, shows that the above-mentioned statements were not true. BP did not have in place a mechanism for conducting operations in a safe and reliable manner, which made an incident of this nature virtually inevitable.  These facts were not disclosed. While highlighting the rewards of its Gulf of Mexico operations, BP actively hid the risks and

31

dangers, the failure to implement appropriate safety measures, and its abdication of appropriate

risk management.

## X.      EARLIER INCIDENTS PROVIDED WARNINGS OF IDENTICAL RISKS

110.    Over ten years ago, a study by the MMS noted that blowouts during cementing

work were continuing with alarming regularity, particularly in the Gulf of Mexico.  Cementing

was a factor in 18 of 39 well blowouts in the Gulf of Mexico between 1992 and 2006.

111.    Halliburton was responsible for cementing a well off the coast of Australia that

blew in August 2009, leaking oil for ten weeks before it was plugged.  MMS investigated that

incident, and an MMS official testified that a poor cement job likely caused the blowout.

112.    Likewise, a 2004 study by federal regulators showed that blowout preventers may

not function in deepwater drilling environments because of the increased force needed to pinch

and cut the stronger pipes necessary to drill at such great depths.  Only three of 14 rigs studied

had blowout preventers able to squeeze off and cut the pipe at the water pressures present at the

equipment's maximum depth.

113.    Moreover, a blowout preventer manufactured by Cameron and another company

was the subject of a dispute between BP and Transocean (the builder and owner of the

Deepwater Horizon) in June 2000.  Cameron also made the blowout preventer that failed on the

Deepwater Horizon.  In the 2000 incident, BP issued a notice of default to Transocean

concerning the functioning of one of Transocean's oil rigs, in which the blowout preventer was

the subject of concern.  Nevertheless, BP used a Cameron-built blowout preventer on the

Deepwater Horizon.  CEO Hayward acknowledged the existence of this dispute in public

comments on May 4, 2010.

114.    In addition, BP was aware of an August 2009 blowout in the Timor Sea off the

coast of Australia, which was found to have been caused by careless cementing work.  During

that incident, which bears a strong resemblance to the Deepwater Horizon disaster, oil leaked

from the site for ten weeks, spreading damage over 200 miles from the well site.

32

## XI.   THE DEEPWATER HORIZON OPERATIONS

115.   BP is the holder of a lease that allows BP to drill for oil and perform oil-related operations at the Macondo well site in the Mississippi Canyon 252 section of the outer continental shelf in the Gulf of Mexico closet to the states of Louisiana, Mississippi, Alabama and Florida.  The Deepwater Horizon, a mobile offshore drilling unit, owned and built by non-party Transocean, had been chartered by BP and the completion operations of the well were directed by BP.  As the operator of the well that the Deepwater Horizon had drilled, BP was ultimately responsible for ensuring that appropriate safety protocols were implemented and followed.

116.   BP's reckless inattention to safety and maintenance issues, however, culminated in the Deepwater Horizon disaster.  Like the Texas City disaster and others, BP had ample warning of problems and ignored them.  BP knew or should have known that in the Gulf of Mexico it was appropriate to spend more money and adopt stricter safety procedures because of the heightened risks and dangers.  BP, however, chose to ignore the known risks to cut costs, all the while assuring the Participants and the public that its Gulf of Mexico operations were maintained and operated with the utmost adherence to safety.

117.   In fact, the risks of offshore drilling were well known to BP, and are especially high in the Gulf, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea.  Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to serious accidents.

118.   BP began drilling the Macondo well on October 7, 2009, using the Marianas rig.  After this rig was damaged in Hurricane Ida on November 9, 2009, BP and the rig operator, Transocean, replaced the Marianas rig with the Deepwater Horizon.  Drilling with the Deepwater Horizon started on February 6, 2010.

119.   The Deepwater Horizon rig was expensive.  Transocean charged BP approximately $500,000 per day to lease the rig, plus contractors' fees.  BP targeted drilling the well to take 51 days and cost approximately $96 million.  According to Steve Tink, the BP

33

Health, Safety and Environmental Manager, the Deepwater Horizon was supposed to be drilling at a new location as early as March 8, 2010. In fact, the Macondo well took considerably longer than planned to complete. By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location, which may have cost BP as much as $21 million in leasing fees alone.

120.    According to one of the survivors of the Deepwater Horizon, BP had known about potential problems on the Deepwater Horizon for months prior to the accident. The survivor informed *60 Minutes* that BP had initially estimated work to take 21 days (3 weeks). However, as a series of unexpected delays extended the time for setting up the latest well to 6 weeks, BP managers became agitated and ordered workers to speed up the schedule. Indeed, in an incident occurring toward the beginning of the Deepwater Horizon drilling, managers pushed the drillers to work so fast that the bottom of the well split open, swallowing tools and drilling fluid and ultimately costing BP not only $25 million, but also forcing them to abandon the well and begin again elsewhere. BP managers related these expenses to the workers on the oil rig to pressure them to speed up work to make up that loss. The Deepwater Horizon survivor told *60 Minutes* that BP was always pressuring them to do their work quickly but when the timeline for the Deepwater Horizon well extended into 6 weeks and after the loss of $25 million in an earlier incident, BP managers ordered the drillers to speed up the rate of penetration. In other words, BP told the drillers to work faster.

121.    Approximately four to five weeks prior to the Deepwater Horizon incident, chunks of the rubber seal called an "annular" on the blowout preventer had broken off and floated to the surface. The annular is a critical part of the blowout preventer used to ensure that explosive gas does not escape to the surface. When informed of the damaged annular, a BP manager referred to this evidence of injury to the sealant as "no big deal." Moreover, BP knew in the weeks and months prior to the incident that the battery on the blowout preventer was weak and that one of the control pods on the blowout preventer was broken. Engineering expert Robert Bea described the malfunctioning control pod as equivalent to "losing one of your legs."

34

122.    As BP was notified of these problems in the weeks and months leading up to the Deepwater Horizon disaster, BP officials publically represented to Participants during the same time period that the company would be able to deliver strong growth in the company in a safe and reliable manner.  For example, on March 22, 2010, CEO Hayward publicly stated that: "Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.  And I am pleased to say that in **2009 we saw continuing improvement in all aspects**."  BP's disregard for safety was never disclosed to the Participants or the public, however, although this fact is clearly material to them and to the market.

123.    On April 9, 2010, almost two weeks before the blowout, BP again encountered an opportunity to correct or address problems encountered in the effort to drill and complete the Macondo oil well, but the company officials once again chose the route that saved time and money at the expense of safety.  Deepwater wells are drilled in sections; the basic process involves drilling through rock, installing and cementing casing to secure the wellbore, and then drilling deeper and repeating the process.  When faced with the final section of the well, however, BP had to decide how to secure the final 1,192 feet of the well.  The company was presented with two options.  The first option involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well, then inserting another steel liner tube called a "tieback" on top of the liner hanger.  The second option involved running a single string of steel casing from the seafloor all the way to the bottom of the well.

124.    Internal BP documents indicate that BP was aware that the second option – the single-casing approach – presented significant and material risks.  BP's own "Forward Plan Review" from mid-April recommended that the company avoid using a single string of casing because of the known risk that problems could lead to a blowout.  BP's Forward Plan Review further identified and recommended the first option, liner-casing, as the option that would best avoid problems in the wellpipe.  Internal communications between BP employees confirm they

35

evaluated and compared these alternative approaches, during a time period in which Brian
Morel, a BP Drilling Engineer, e-mailed a colleague to complain: "this has been [a] nightmare
well which has everyone all over the place." Despite the risks, BP chose to install the single
string of casing instead of a liner and tieback. On March 25, 2010, Mr. Morel e-mailed Allison
Crane, the Materials Management Coordinator for BP's Gulf of Mexico Deepwater Exploration
Unit, that the long casing string "saves a lot of time . . . at least 3 days." On March 30, he e-
mailed Sarah Dobbs, the BP Completions Engineer, and Mark Hafle, another BP Drilling
Engineer, that "[n]ot running the tieback . . . saves a good deal of time/money." On April 15, BP
estimated that using a liner instead of the single string casing "will add an additional $7 - $10
MM to the completion cost." The same document calls the single string of casing the "[b]est
economic case and well integrity case for future completion operations."

125.    Around this time, BP prepared another updated version of its "Forward Plan
Review." In direct contrast to the prior version, this version called the long string of casing "the
primary option" and the liner "the contingency option." Although the Forward Plan
acknowledged the risks of a single string of casing, it described the option as the "[b]est
economic case and well integrity case for future completion operations."

126.    BP similarly chose time and money in favor of safety in deciding on the number
and placement of centralizers, or attachments that go around the casing as it is lowered into the
well to keep it in the center of the borehole. If the well is not properly centered prior to the
cementing process, there is increased risk that channels will form in the cement that allow gas to
flow up the annular space around the casing. On April 15, 2010, BP informed Halliburton's
Account Representative, Jesse Gagliano, that BP was planning to use 6 centralizers on the final
casing at the Macondo well. Gagliano quickly responded that the well in fact needed 10
centralizers to produce a "moderate" gas flow problem, and would need 21 centralizers to
achieve only a "minor" gas flow problem. To this, Mr. Morel responded: "As far as changes,
it's too late to get any more product on the rig, our only option[] is to rearrange placement of
these centralizers."

0093040/001/ 469664v01

127.   Internal e-mails recently uncovered reveal that BP had made such questionable decisions in the past. Gregory Walz, BP's Drilling Engineering Team Leader, informed John Guide, BP's Well Team Leader, that, "we need to honor the modeling to be consistent with our previous decisions to go with the long string . . . I wanted to make sure that we did not have a repeat of the last Atlantis job with questionable centralizers going into the hole." In response, Guide wrote, "it will take 10 hrs to install them . . . I do not like this and . . . I [am] very concerned about using them." A later e-mail from Brett Cocales, BP's Operations Drilling Engineer, revealed BP's callous cost/benefit calculation in deciding not to install additional centralizers: "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job. I would rather have to squeeze than get stuck . . . So Guide is right on the risk/reward equation."

128.   Another egregious decision by BP involved the failure to circulate fully the drilling mud in the well before cementing. This procedure, known as "bottoms up," involves circulating drilling mud from the bottom of the well all the way to the surface. This allows workers to test the mud for influxes of gas, permits a controlled release of gas pockets that may have entered the mud, and ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement. However, although BP's April 15 operations plan called for a bottoms-up procedure, BP did not fully circulate the mud. Instead, BP ultimately chose to circulate only 261 barrels of mud, a small fraction of the mud in the Macondo well. Halliburton has stated its belief that this decision was due to BP's concern for speed, as a full circulation of mud would have taken at least 12 hours.

129.   BP's dedication to time and cost saving continued as the well came closer to completion. Cement bond logs, or acoustic tests conducted by running a tool inside the casing after the cementing is completed, determine whether the cement has bonded to the casing and surrounding formations. If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job. On April 18, 2010, BP flew a crew to perform a cement bond log. On April 20 at 7:00 am, however,

37

BP inexplicably informed the crew that their services would no longer be required, even though pressure testing of the well had not been completed. This decision would ultimately prove catastrophic.

130.    BP's reasons for not testing the well can be attributed to their concern for time and money. The cement bond log would have cost the company over $128,000 to complete. In comparison, the cost of canceling the service was just $10,000. Time was a concern as well; Halliburton estimated that conducting the test would have taken an additional 9 to 12 hours, and remediating any problems would have taken still more time.

131.    Not only did the blowout preventer on the Deepwater Horizon fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail. Worse, BP failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

132.    First, BP consciously elected not to install an acoustically activated remote-control shut-off valve to the well, costing only $500,000. Second, BP chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. BP ignored these precautions despite being well aware of the increased risk of a failure of the primary blowout safety mechanism, the blowout preventer, from deep-sea operators. By contrast, the replacement cost of the Deepwater Horizon is $560 million. BP has so far incurred $350 million in costs because of the incident and is incurring at least an additional $6 million per day trying to contain the spill. The total expenses of containment and clean-up could reach $10 billion.

133.    Further, BP's direction of the completion operations of the well, in particular the installation of the final cement casing at the wellhead prior to the conclusion of the exploratory phase of the well, was carried out by Halliburton and BP with extreme recklessness. As the *New York Times* reported on May 3, 2010:

> More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well-a possible factor that could have contributed to the explosion.

38

The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil.

Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.

The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal. The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said. But idling a rig to address such a problem can cost huge sums ... [L]awyers said that supervisors either missed or ignored the signals and proceeded with the job.

When workers released the last valves that were holding back the natural gas that had built up inside the well, the gas shot up the pipe and sprayed into the drilling rig, igniting the fireball that caused the deaths of 11 workers, injured others and sank the rig ....

134.    Employees working on the Deepwater Horizon experienced recurring problems with pockets of highly flammable natural gas forcing its way up the drilling pipes. Prior to the Deepwater Horizon incident, BP did not view these incidents as problematic, but instead stated that the gas was likely to only create a "negligible" risk. The government, however, cautioned the company that gas buildup was a genuine concern and that BP should take note and "exercise caution." In the weeks leading up to the Deepwater Horizon incident, so much natural gas rose to the surface that an emergency announcement called for a stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters.

135.    Despite the dangers posed by the extreme gas build up, BP allowed Halliburton to employ a risky technique of mixing nitrogen gas into the cement to create a mousse-like compound. Employees on the Deepwater Horizon have suggested that workers were motivated to finish early to earn bonuses for finishing the job ahead of schedule.

136.    The *New York Times* also reported that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the

39

rig had been drilling deeper than 22,000 feet, even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep ..."

## XII.   THE EXPLOSION AND SINKING OF THE DEEPWATER HORIZON AND BP'S EFFORTS TO CONCEAL THE SEVERITY AND RAMIFICATIONS OF THE SPILL

137.   Between 10:00 p.m. to 11:00 p.m. on April 20, 2010, an explosion erupted on the Deepwater Horizon. The explosion killed eleven workers. The Deepwater Horizon sank two days later. Since then, oil has been gushing from the Macondo well without abatement. To date, over 3 million barrels of crude oil have poured into the Gulf of Mexico, a quantity that is augmented by additional releases of an estimated 35-65,000 barrels of oil per day. The Deepwater Horizon was connected to the wellhead on the sea floor by a 5,000 foot pipe called a riser. As the Deepwater Horizon sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater and now snakes along the ocean floor. Oil is leaking from the open end of the riser and from three places along its length, including one location almost at the wellhead. BP's initial response to the Deepwater Disaster was lackluster and only intensified the damage.

138.   After the explosion, BP attempted to downplay and conceal the severity of the oil spill. BP's initial leak estimate of 1,000 barrels (42,000 gallons) per day was found by government investigators to be a fraction of what the investigators initially (but wrongly) concluded was a leak rate of 5,000 barrels (200,000 gallons) per day. Moreover, BP was slow and incomplete in its announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

139.   While BP had initially tried to convince the public that the Deepwater Horizon was discharging only 1,000 barrels a day, the evidence soon forced them to revise their estimate to approximately 5,000 barrels of oil a day, which was and is still far too low. In fact, experts estimate that the Deepwater Horizon may be discharging up to 65,000 barrels of oil a day. As of May 7, 2010, the oil spill has been measured at about 130 miles by 70 miles.

140.   Experts and analysts are still investigating the causes of this tragedy.  According to a preliminary analysis, bad wiring and a leak in what was supposed to be a "blowout preventer" may have contributed to the explosion.  Sealing problems may have allowed a methane eruption.  Even a dead battery may have been part of the cause of the incident.

141.   Congressional investigators revealed on May 12, 2010, that the key safety system, the blowout preventer, used in BP's oil-drilling rig in the Gulf had a hydraulic leak and a failed battery that probably prevented it from working as designed.  Based on new disclosures, it was revealed that a complicated cascade of deep-sea equipment failures and procedural problems played a major role in the oil rig explosion and massive spill that is still fouling the waters of the Gulf of Mexico and threatening industries and wildlife near the coast and on shore.  All of these problems were the result of BP's failure to follow its representations to its ESP Plan Participants and the public regarding its purported commitment to safety.

142.   On May 12, 2010, Defendant McKay testified to the House of Representatives Subcommittee on Oversight and Investigations, Committee on Energy and Commerce that BP did not have the capability and technology to respond to the Deepwater Horizon oil spill, confirming that BP's prior representations concerning disaster recovery and safety were untrue:

> **Mr. McKay**:  … We are using the best technology at scale.  This is the largest effort that has ever been put together.  So we believe we are using the best technology and if we have any other ideas …
>
> **Mr. Capps**: But you never had any until it happened.
>
> **Mr. McKay**:  Well, we have been drilling with the Coast Guard for years.
>
> **Mr. Capps**:  Did you develop technologies for dealing with this?
>
> **Mr. McKay**:  Not individual technologies for this, no.
>
> **Mr. Capps**:  I rest my case.

Congressional Hearing Transcript, at 137.

41

143.   According to Representative Henry Waxman (D-Calif.), BP told the House Energy and Commerce Subcommittee on Oversight that the well that exploded had failed a key pressure test hours before the April 20, 2010 explosion. "Significant pressure discrepancies were observed in at least two of these tests, which were conducted just hours before the explosion," said Rep. Waxman, citing documents his committee had received from BP. According to Steven Newman, president of Transocean, and Defendant McKay, president of BP America, these pressure readings were worrisome. Despite these worrisome pressure readings, according to Rep. Waxman, "it appears the companies did not suspend operations, and now 11 workers are dead and the Gulf faces an environmental catastrophe." These problems are emblematic of a systemic and cultural failure at BP to disregard safety and risk management, undisclosed to ESP Plan Participants and the public.

144.   Workers on the Deepwater Horizon told BP internal investigators in interviews that the blowout was triggered by a bubble of methane gas that escaped from the drilling well and shot up the drill column. The bubble expanded quickly after it escaped from the drilling well and burst through several seals and barriers before exploding.

145.   The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were a direct result of the inadequate safety protocols put into place by BP. If BP had adequately informed shareholders and the public of its poor safety records, such risk would have been appropriately priced into the BP ADSs and the BP Stock Fund.

146.   On May 10, 2010, BP Chief Operating Officer Doug Suttles admitted that Company was woefully unprepared to mitigate the damage of the Deepwater Horizon incident due to its location. Suttles stated, "There's a lot of techniques available to us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

147.   BP has already allocated $20 billion as a short term response to cover containment efforts, commitments to the Gulf Coast states, federal costs and the settlement of certain claims arising from the destruction of natural resources in the Gulf Coast region. This

$20 billion deposit, substantial as it is, will in all likelihood prove insufficient to cover the full range of liabilities and costs that BP will incur because of the Macondo oil well spill.

148.    As the oil continues to make landfall along the Gulf Coast, the continuing contamination from the spill will cause severe damages to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, and Florida, destroying habitats where countless species of fish and marine life breed, spawn, and mature.  The timing of this disaster makes it even more damaging, as May is spawning season for much sea life and is migration time for many species of shrimp and pelagic fish. Devastation of so many species will severely damage and perhaps even destroy the livelihoods of many commercial fishing interests in the area.  The National Oceanographic and Atmospheric Administration ("NOAA") may soon declare that a 6,800-square-mile area is a "fisheries disaster."

149.    In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output.  Nearly a third of all marine recreational fishing trips, including the $1 billion-per-year sport fishing industry, take place on Gulf waters.  In 2008, 3.2 million recreational fishermen in the Gulf of Mexico took 24 million fishing trips.  All of these activities and businesses are now in serious jeopardy.

150.    Unlike the 1989 Exxon Valdez disaster, which involved an oil tanker with a limited amount of oil, the Deepwater Horizon catastrophe involves a flow of oil that will continue unabated unless affirmative steps are successful in shutting down the discharge. Experts estimated that the volume of the continuous gush of oil into the Gulf eclipsed the Valdez spill within 50 days.

151.    Pursuant to the Oil Pollution Act of 1990, the federal government has assigned responsibility for the cleanup to BP.  The Act provides for the recovery, among other things, of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

152.     Although liability under federal law is capped under the Act at $75 million,

legislation is moving through Congress that would raise the liability cap to $10 billion and make

that change retroactive - *i.e.,* fully applicable to BP with respect to the Deepwater Horizon

disaster.

153.     Moreover, even before legislative efforts were initiated to raise the cap, CEO

Hayward - in an implicit admission of liability - announced that BP would voluntarily pay in

excess of the liability cap imposed by the Act to remediate the problem.

154.     The *New York Times* reported on April 29, 2010:

> But regardless of the out-of-pocket costs, the long-term damage to BP's
> reputation - and possibly, its future prospects for drilling in the Gulf of Mexico -
> is likely to be far higher, according to industry analysts.

> The magnitude of the Deepwater Horizon disaster seems to be finally sinking in
> with investors.  BP's stock plunged more than 8 percent Thursday in American
> trading in an otherwise strong day for stocks.  Since the accident, the American
> depositary receipts of the company have fallen about 13 percent, closing Thursday
> at $52.56.

> For Tony Hayward, who has led BP for the last three years, the accident
> threatens to overshadow all of the efforts he has made to burnish the tattered
> reputation of the company after a refinery explosion in Texas in 2005 and a
> pipeline leak in Alaska in 2006.

> As Mr. Hayward said to fellow executives in his London office recently,
> "What the hell did we do to deserve this?"

> A BP spokesman said no executives were available for an interview
> Thursday.  But in response to a written question, Mr. Hayward said,
> "Reputationally, and in every other way, we will be judged by the quality,
> intensity, speed and efficacy of our response."

155.     The Deepwater Horizon oil spill also caused losses to the energy sector.  In 2008,

offshore drilling in the Gulf produced about 1.15 million barrels per day, about one-third of total

domestic crude production.  Offshore energy production facilities are highly sensitive to external

conditions and frequently have to stop operations when threatened by spills, storms or other

unusual circumstances.  Floating oil in the Gulf of Mexico poses the threat of fire and constitutes

44

a threat to the health of workers.  Nearby rigs might have to be shut down if the oil spreads to them. Three platforms already have been evacuated because they were close to the Deepwater Horizon site.  As the oil spill expands, other rigs in the Gulf could face this problem.

## XIII.   THE ESP PLAN LOSSES EXCEED $1 BILLION

156.    As a result of the Deepwater Horizon spill and the disturbing revelations about BP's disregard of risk management and safety practices, BP's Stock Fund has lost nearly 50% or over $1 billion of its value.  On April 20, 2010, the price of one BP ADS was approximately $60. Following the explosion, BP ADSs began a continuous decline.  Within a week, the share price had dropped to approximately $50.  BP ADSs currently trade at approximately $29.

157.    The decline was and is directly related to the market absorption of information revealing risks concealed by BP throughout the Class Period, specifically that BP conducted its operations in the Gulf without a legitimate spill plan and BP's pledges and promises about reforming the culture of BP were false.

158.    On June 1, 2010 (the first day of trading following the failure of BP's "top kill" plan to stop the leak), BP suffered its biggest one-day share drop in 18 years.  In addition, to the "top kill" failure, the market absorbed the fact that United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP.  That same day, UBS raised its estimates for total spill costs from $12 billion to $40 billion.  In particular, news of the Attorney General's action and BP's failure and inability to cap the well and stop the leak as well as the cost of containment, caused the share price of BP ADSs to lose another 15% in value, closing on June 1, 2010 at $36.52 per ADS, on heavy trading volume.

159.    The financial press issued searing statements on June 1, 2010.  For example, the *Express* quoted Giles Watts, the head of equities at City Index, as follows: "The BP oil Spill has not just been an ecological disaster, but it has the potential to be a shareholder disaster, too."  In addition, during an interview on the Financial Sense Newshour, energy investor Matthew Simmons estimated that the actual flow rate was 120,000 barrels a day.  Simmons said about the spill: "It may be the worst ecological catastrophe the world has ever had.  Simmons indicated

45

that fishing and related industries off of the Mexican and U.S. coasts might be destroyed for generations, opening up BP to substantial legal exposure that would prevent a mega-merger.

160.     Thus, the June 1, 2010 closing price represented a cumulative decline in value of nearly 24% per ADS since April 20, 2010, or approximately 40% in value.  Again, this decline was directly related to the market absorbing previously undisclosed information revealing risks concealed by BP during the Class Period, and, in particular, how it conducted its operations in the Gulf without a legitimate spill response plan, its material misrepresentations and material concealments about the absolute failure to BP to live up to its public pledges and promises regarding its safety program, and the ultimate cost of the spill recovery effort.

## COUNT ONE:

### Breach of Fiduciary Duty – Failure to Prudently and Loyally Manage the ESP Plan and ESP Plan Assets (Against all Defendants)

161.     Plaintiff incorporates by reference all allegations of this Complaint as set forth in the paragraphs above.

162.     At all relevant times, Defendants were named fiduciaries pursuant to ERISA 402(a)(1) [29 U.S.C. § 1102(a)(1)], or de facto fiduciaries with the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)], or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

163.     As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the ESP Plan and the disposition of the assets of the ESP Plan and were, during the Class Period, responsible for ensuring that the ESP Plan's investment options, including the BP Stock Fund and BP ADSs, made available to the Participants, were prudent, and are liable for losses incurred as a result of the imprudence of such investments.

164.     Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D) [29 U.S.C. § 1104(a)(1)(D)].  Thus, fiduciaries may not blindly follow plan documents or directives that

46

would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

165.   Defendants were obligated to discharge their duties with respect to the ESP Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B) [29 U.S.C. § 1104(a)(l)(B)].

166.   According to ERISA § 404, a fiduciary's investment or investment course of action is prudent if: (a) he or she has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the ESP Plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he or she has acted accordingly.

167.   Appropriate consideration in this context includes, but is not necessarily limited to:  (1) a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (2) consideration of the following factors as they relate to such portion of the portfolio: (a) the composition of the portfolio with regard to diversification; (b) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) the projected return of the portfolio relative to the funding objectives of the plan.

168.   Given the gross mismanagement of BP and its related entities as discussed herein, Defendants breached their duties of prudence and loyalty by continuing to offer the BP Stock

47

Fund at a time when almost one-third of the assets of the ESP Plan were invested in the BP Common Stock Fund, and unbeknownst to Participants, the risk of a catastrophic disaster threatening the viability of BP increased to unacceptable levels as BP blatantly violated safety protocols and exposed BP to billions of dollars in liability.

169.   The participation in and knowledge of BP's and its related entities' dire situation as alleged herein is imputed and attributed to each Defendant.

170.   Defendants breached their duties to prudently and loyally manage the ESP Plan's assets.  During the Class Period, Defendants knew or should have known that the BP Stock Fund and BP ADSs were not a suitable and appropriate investment for the ESP Plan as described herein.  Nonetheless, during the Class Period, Defendants continued to invest the ESP's assets in the BP Stock Fund and BP ADSs instead of other, more suitable, investments.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the ESP Plan, and indirectly Plan Participants and beneficiaries, from suffering losses as a result of the ESP Plan's investment in the BP Stock Fund and BP ADSs.

171.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP Plan, and Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investment.

172.   Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3) [29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3)], Defendants named in this count are liable to restore the losses to the ESP Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT TWO:

### Failure to Provide Complete and Accurate Information
### (Against All Defendants)

173.   Plaintiff incorporates by reference all allegations of this Complaint as set forth in the paragraphs above.

48

174.   As all relevant times, the scope of the fiduciary responsibility of all Defendants included Plan-related communications and material disclosures.

175.   The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan assets, and to disclose information participants need to exercise their rights and interests.  This duty to inform participants includes an obligation to provide plan participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding investment options such that participants can make informed decisions with regard to prudence of investing in such options as are made available.  This duty applies to all plan investment options, including investment in the stock of the participants' employer.

176.   During the Class Period, upon information and belief, Defendants made direct and indirect communications with Plaintiff and the Participants, including statements regarding investments in the BP Stock Fund and BP ADSs.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including SPDs and/or prospectuses regarding the Plan's holdings of BP ADSs), which included and/or reiterated these statements.  During the Class Period, BP's SEC filings were incorporated into and part of the SPDs and/or the registration statements.

177.   Further, Defendants, as the ESP Plan's fiduciaries, knew or should have known certain facts about the characteristics and behavior of the Participants' well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that: (1) out of loyalty, employees tend to invest in company stock; (2) employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward; (3) employees tend not to change their investment option allocations in the plan once made; (4) no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely; (5) lower income

49

employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and (6) even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

178.    While Defendants knew or should have known these facts and knew of the high concentration of the ESP Plan's funds in the BP Stock Fund and BP ADSs, they still disseminated inaccurate, incomplete, and materially misleading statements Plan-wide regarding BP's and its related entities' safety protocols in place for its oil and gas operations and/or did nothing to correct such statements.

179.    Defendants knew or should have known that investment in the BP Stock Fund and BP ADSs carried with it an inherently high degree of risk.  This inherent risk made Defendants' duty to provide complete and accurate information particularly important.

180.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding BP's and its related entities' potential exposure to liability on account of its inadequate safety protocols, and the consequent risk and inflation of the value of the BP Stock Fund and BP ADSs and, generally, by conveying inaccurate information regarding BP's and its related entities' operations.  These failures were particularly devastating to the ESP Plan and the Participants - losses in this investment had an enormous impact on the value of Participants' retirement assets.

181.    These actions and failures to act were uniform and caused the ESP Plan, and/or the Participants and beneficiaries of the ESP Plan, to continue to make and maintain substantial investments in the BP Stock Fund and in BP ADSs at a time when Defendants knew or should have known that the Participants and beneficiaries lacked complete and accurate information concerning their investment in the BP Stock Fund and BP ADSs.  Plaintiff and the Participants relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of the BP Stock Fund and BP ADSs.

182.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan resulting in harm to the

50

participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.  Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the BP Stock Fund and BP ADSs and were material to any reasonable person's decision about whether or not to invest or maintain any part of his or her invested assets of the ESP Plan in the BP Stock Fund and BP ADSs during the Class Period.  Plaintiff and the Participants are therefore presumed to have relied to their detriment on the misleading statements, acts and omissions of the Defendants as described herein.

183.   As a consequence of Defendants' breaches of fiduciary duty, the ESP Plan and the BP Stock Fund suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to manage prudently and invest the ESP Plan's assets, the losses suffered by the ESP Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP Plan, and Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investments.

184.   Pursuant to ERISA § 502(a) [29 U.S.C. § 1132(a)] and ERISA § 409 [29 U.S.C. § 1109(a)], Defendants are liable to restore the losses to the ESP Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT THREE:

### Breach of Fiduciary Duty for Failure to Monitor Fiduciaries
### (Against Defendants BPNA and the BPNA Board)

185.   Plaintiff incorporates by reference all allegations of this Complaint as set forth in the paragraphs above.

186.   This Count alleges fiduciary breaches against Defendants BPNA and the BPNA Board.

187.   As alleged above, during the Class Period, BPNA and the BPNA Board  were fiduciaries of the ESP Plan pursuant to ERISA § 402(a)(1) [29 U.S.C. § 1102(a)(1)], or de facto

51

fiduciaries of the ESP Plan within the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)], or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

188.   As alleged above, the scope of the fiduciary responsibilities of BPNA and the BPNA Board included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries of the ESP Plan, including the members of the Savings Plan Committee.

189.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

190.   The monitoring duty further requires, among other things: (1) establishing procedures so that on an ongoing basis monitoring fiduciaries may review and evaluate the performance of the named fiduciaries and ensure that they are doing an adequate job (for example, by requiring periodic reports on their work and the ESP Plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need); (2) providing complete and accurate information to the appointed fiduciaries so that they can prudently manage the plan and the plan assets, and (3) providing information that may have an impact on the plan or the monitored fiduciaries' investment decisions regarding the plan.  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or deciding whether to retain or remove them.

191.   Here, BPNA and the BPNA Board breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about BP's and its related entities' business problems alleged above, which made the BP Stock Fund and BP ADSs an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries evaluate and  appreciate the unjustified risk of significant investment loss by rank and file employees in their respective plan accounts.

52

192.    In addition, BPNA and the BPNA Board, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of BP and its related entities that they indisputably knew or should have known, that the monitored ESP Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, BPNA and the BPNA Board breached their fiduciary duties under the ESP Plan and ERISA.

193.    BPNA and the BPNA Board are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, they enabled the breaches by these Defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

194.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP Plan, and Plaintiff and the other Participants and beneficiaries, lost a significant portion of their retirement investment.

195.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3) [29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3)], BPNA and the BPNA Board are liable to restore the losses to the ESP Plan caused by their breach of fiduciary duties as alleged in this Count and to provide other equitable relief as appropriate.

## COUNT FOUR:

### Breach of Fiduciary Duty to Avoid Conflicts of Interest
### (Against Defendants Malone, Adkins, Dorazil, McKay, Shaw, Taylor, and Williamson)

196.    Plaintiff incorporates by reference all allegations of this Complaint as set forth in the paragraphs above.

197.    Malone, Adkins, Dorazil, McKay, Saw, Taylor, and Williamson are collectively referenced in this Count as the "Individual Defendants."  At all relevant times, as alleged above, the Individual Defendants were fiduciaries of the ESP Plan within the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)].

53

198.    ERISA § 404(a)(1)(A) [29 U.S.C. § 1104(a)(1)(A)] imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

199.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

200.    Upon information and belief, because the compensation of many of the Individual Defendants was significantly tied to the price of BP ADSs, Defendants had an incentive to keep the ESP Plan's assets heavily invested in the BP Stock Fund and BP ADSs on a regular, ongoing basis.  Elimination of BP ADSs as an investment option would have reduced the overall market demand for BP ADSs and sent a negative signal to Wall Street analysts, which would have adversely affected the price of the BP Stock Fund and BP ADSs, resulting in lower compensation for the Individual Defendants.

201.    Some Defendants may have had no choice in tying their compensation to BP ADSs (because compensation decisions were out of their hands), but Individual Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in the BP Stock Fund and  BP ADSs.

202.    These conflicts of interest put the Individual Defendants in the position of having to choose between their own interests and the interests of the Participants.

203.    Defendants placed their own interests in investing the ESP Plan assets in the BP Stock Fund and BP ADSs over the Participants' interests in maintaining a prudently invested ERISA plan.

204.    Pursuant to ERISA § 502(a)(2) [29 U.S.C. § 1132(a)(2)] and ERISA § 409 [29 U.S.C. § 1109(a)], the Individual Defendants are liable to restore the losses to the ESP Plan caused by their breaches of fiduciary duties alleged in this Count.

54

## COUNT FIVE:

**Breach of Fiduciary Duties**
**in Violation of ERISA §§ 404 and 405**
**(Co-Fiduciary Liability)**
**(Against All Defendants)**

205.   Plaintiff incorporates by reference all allegations of this Complaint as set forth in the paragraphs above.

206.   This Count alleges co-fiduciary duty against all Defendants.

207.   By virtue of all the facts and events alleged herein, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1) [29 U.S.C. § 1102(a)(1)], or de facto fiduciaries within the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)], or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

208.   ERISA § 405(a) [29 U.S.C. § 1105] imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  Defendants breached all three provisions.

209.   ERISA § 405(a)(3) [29 U.S.C. § 1105] imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

210.   Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a)(1), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches.  Accordingly, Defendants are each liable for the others' violations pursuant to ERISA §§ 405(a)(2) and (3) [29 U.S.C. §§ 1105(a)(2) and (3)].

211.   Co-fiduciary liability arises hereunder, *inter alia*, by virtue of the following:

55

a.      Defendants knew or should have known of BP's and its related entities' material misrepresentations and material omissions concerning safety and maintenance procedures and reporting, which were carried on for the benefit of BP's business.  As such, the knowledge of the existence of such material misrepresentations and material omissions concerning safety and maintenance procedures and reporting is imputed to all Defendants as a matter of law.

b.      Defendants BPNA and the BPNA Board, with knowledge of the material misrepresentations and material omissions concerning safety and maintenance procedures and reporting irregularities, failed to properly monitor the performance of the Savings Plan Committee and the Committee Members or to communicate to them and the Trustee such information as each needed for the proper performance of their duties, as required of ESP Plan Fiduciaries.

c.      As a result of these breaches in violation of ERISA § 404(a)(1), BPNA and the BPNA Board enabled the Savings Plan Committee and its Committee Members to commit breaches of duty, had knowledge of such breaches and failed to make reasonable efforts under the circumstances to remedy the breaches.  Consequently, BPNA and the BPNA Board are liable co-fiduciaries under ERISA § 405(a)(2) and (3).

d.      The Savings Plan Committee and the Members thereof, by virtue of their positions participated in and/or knew about the BP's and its related entities' inappropriate safety practices, and their consequences, including the resulting imprudence of the BP Stock Fund and BP ADSs as an investment for the ESP Plans' assets.  The Savings Plan Committee and the Members thereof breached their duties by continuing to invest the ESP Plan's assets in the BP Stock Fund and BP ADSs when it was no longer prudent to do so, and providing incomplete and inaccurate information to Participants.  Yet, the Savings Plan Committee and the Members thereof failed to undertake any effort to remedy these breaches.  Instead, they compounded them by obfuscating the risk that BP's improper safety activities posed to BP, and, thus, to the BP ADSs, the BP Stock Fund and the ESP Plan.

56

e.    BPNA is also liable for the breaches of duty by the BPNA Board, the Savings Plan Committee and the Committee Members under the law of agency, including the principles of vicarious liability and *respondeat superior*; and BPNA is liable as an indemnitor of these Defendants pursuant to applicable corporate law and under the terms of the applicable articles of incorporation, by-laws and other documents of corporate governance, for the losses caused by the breaches of these Defendants.

212.    The failure of Defendants to monitor co-fiduciaries enabled them to breach their fiduciary duties.

213.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP Plan, and Plaintiff and the Participants, lost a significant portion of their retirement savings.

214.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3) [29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3)], Defendants are liable to restore the losses to the ESP Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of the ESP Plan and its Participants and beneficiaries, prays for relief as follows:

A.    That judgment be entered for the Plaintiff and the ESP Class on behalf of the ESP Plan, determining that Defendants, and each of them jointly and severally, breached their fiduciary duties owed to the ESP Plan and its Participants and beneficiaries and engaged in prohibited transactions under Count One through Count Five;

B.    That Defendants, and each of them jointly and severally, restore to the ESP Plan and its Participants and beneficiaries the losses sustained by the ESP Plan and its Participants and beneficiaries due to the breaches of fiduciary duties under Count One through Count Five, in an amount to be proven at trial;

57

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the ESP Plan as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of the ERISA fiduciary obligations;

E.    Actual damages in the amount of any losses the ESP Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the ESP Plan's recoveries to the accounts of all Participants who had their accounts invested in the BP Stock Fund and/or BP ADSs maintained by the ESP Plan in proportion to the accounts' losses attributable to the precipitous decline in the share price of BP ADSs.

G.    That an appropriate class of ESP Plan Participants be certified and designated by the Court to receive the amounts restored to the ESP Plan by Defendants;

H.    That the Court award reasonable attorney fees, costs and expenses to class counsel under 29 U.S.C. section 1132(g) and/or in accordance with the laws and rules governing class actions and common funds, under Rule 23 of the Federal Rules of Civil Procedure; and

I.    For such further legal, equitable and remedial relief that this Court deems just and proper to protect the legitimate rights of Plaintiff, the ESP Plan and the ESP Plan Class.

58

## REQUEST FOR JURY TRIAL

Plaintiff, individually and on behalf of the ESP Plan, the ESP Plan Class and the

Participants, hereby requests a trial by jury of the allegations set forth herein.


Dated: July 9, 2010.              By:    /s/ Ronald S. Kravitz
                                         Ronald S. Kravitz

                                         **LINER GRODE STEIN YANKELEVITZ**
                                         **SUNSHINE REGENSTREIF & TAYLOR LLP**
                                         Ronald S. Kravitz
                                         Randall J. Sunshine
                                         Kim Zeldin
                                         199 Fremont Street, Suite 2000
                                         San Francisco, CA 94105
                                         Tel: 415.489.7700
                                         Fax: 415.489.7701

                                         Thomas R. Ajamie
                                         Dona Szak
                                         **AJAMIE LLP**
                                         Pennzoil Place – South Tower
                                         711 Louisiana, Suite 2150
                                         Houston, TX 77002
                                         Tel: 713.860.1600
                                         Fax: 713.860.1699

                                         *Attorneys for Plaintiff Humphries*


                                         Mitchell L. Marinello
                                         Laura E. Towbin
                                         **NOVACK AND MACEY LLP**
                                         100 N. Riverside Plaza, Suite 1500
                                         Chicago, Illinois 60606
                                         Tel: 312.419.6900
                                         Fax: 312,419.6928

                                         *Local Counsel for Plaintiff Humphries*